IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

CHRISTOPHER MICHAEL LeCLAIRE                                             PLAINTIFF

v.                        Civil No. 2:22-CV-02131-PKH-MEF

DEPUTY RICHARD DYER,
Crawford County Sheriff's Department;
DEPUTY BRANDON CHANCEY,
Crawford County Sheriff's Department                                     DEFENDANTS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Christopher Michael LeClaire ("LeClaire"), a prisoner, filed this civil rights action pursuant to 42 U.S.C. § 1983. LeClaire proceeds *pro se* and *in forma pauperis* ("IFP"). (ECF No. 3).

Currently before the Court is the Defendants' Motion for Summary Judgment. (ECF No. 41). Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3), the Honorable P. K. Holmes, III, Senior United States District Judge, referred the Motion for Summary Judgment to the undersigned for the purpose of making a Report and Recommendation. For the reasons outlined below, the undersigned **RECOMMENDS** that the Motion for Summary Judgment (ECF No. 41), be **GRANTED** and that this matter be **DISMISSED WITH PREJUDICE**.

## I.        BACKGROUND[1]

This Court initially recommended that these proceedings be stayed and administratively

---

[1] This section does not endeavor to reference every docket entry; instead, it contains only the procedural posture relevant to the Court's analysis of the Defendants' Motion for Summary Judgment.

1

closed pursuant to *Younger* abstention principles because the factual predicate of the Complaint also established the basis for Plaintiff's pending criminal charges.   (ECF No. 6).   That recommendation was adopted without objection.   (ECF No. 7).   After Plaintiff's criminal proceedings resolved, he requested that the stay be lifted.   (ECF No. 8).   This Court granted that request and directed him to file an Amended Complaint.   (ECF No. 9).   Plaintiff filed the Amended Complaint, identifying Deputy Richard Dyer (Crawford County Sheriff's Department), Deputy Brandon Chancey (Crawford County Sheriff's Department), and Brian Tejada (Parole Officer, Sebastian County) as defendants.   (ECF No. 10).   The Court ordered that the Amended Complaint be served on those Defendants.   (ECF No. 11).   Defendants Dyer and Chancey (the "County Defendants") filed an Answer.   (ECF No. 13).   Separate Defendant Tejada filed a Motion to Dismiss and Memorandum in support.   (ECF Nos. 17-18).   Upon consideration of the Motion to Dismiss, it was recommended that the claims against Defendant Tejada be dismissed and that he be terminated from this case.   (ECF No. 22).   That recommendation was subsequently adopted.   (ECF No. 28).

The County Defendants then filed a Motion to Dismiss on the grounds that Plaintiff failed to update his contact information in accordance with Local Rule 5.5(c)(2).   (ECF No. 33). Plaintiff subsequently filed Notice of Change of Address.   (ECF No. 37).   Accordingly, the Court found Defendants' Motion to Dismiss to be moot.   (ECF No. 40).

This case is now before the Court on Defendants' Motion for Summary Judgment on the merits, along with a Memorandum and Statement of Facts in Support.   (ECF Nos. 41-43). Plaintiff has filed a response in opposition, along with a statement of indisputable material facts and brief in support.   (ECF Nos. 45-47).   Defendants have not filed a reply.   The Defendants'

2

Motion for Summary Judgment is ripe for the Court's consideration.

## II.    LEGAL STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party." *Ward v. Olson*, 939 F. Supp. 2d 956, 961 (D. Minn. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is material only when its resolution would affect the outcome of a case. *Anderson*, 477 U.S. at 248.

Further, the moving party bears the initial burden of identifying "those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2001). In response, the non-moving party "may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002). In considering a summary judgment motion, the Court views all the evidence and inferences in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255.

## III.    SUMMARY OF THE FACTS

The Court starts first with the undisputed facts: On March 1, 2022, Crawford County Sheriff's Deputies Chancey and Dyer were near 141 N. Arkansas Ave. in Crawford County, Arkansas, when they observed a dark colored Scion XB ("SUV") leave the residence located at that address and head south on N. Arkansas Avenue. (ECF No. 43-2). Defendant Dyer traveled behind the SUV and conducted a traffic stop after observing the SUV fail to use its turn signal during the approach or while stopped at the stop sign. *Id*. at 1.

3

As the vehicle was stopping, Defendant Dyer "could see two occupants inside the vehicle moving around and digging in the back seat of the vehicle and under the front seats." (ECF No. 43-2, p. 14). When the vehicle stopped, Defendant Dyer contacted the driver, Roshelle Adams, and the passenger, identified as the Plaintiff, and requested their identification. *Id*. Adams told Defendant Dyer that she did not have her identification on her person. *Id*. When Defendant Dyer asked them where they were going, Adams told him they were going home, but Plaintiff told him they were traveling to Wal-Mart. *Id*. At this point, the Defendants' and Plaintiff's versions of events begin to diverge. On motion for summary judgment, the Court must take the non-movant's version of events as true unless it is "blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Thus, the Court first considers Plaintiff's version.

### A.      Plaintiff's Version[2]

When Plaintiff handed Defendant Dyer his identification, he told him there was an active

---

[2] In response to Defendants' Motion for Summary Judgment, Plaintiff filed a "Response to the Motion for Summary Judgment" (ECF No. 45); "Statement of Indisputable Material Facts: Affidavit of Christopher LeClaire" (ECF No. 46); "Brief in Support of Plaintiff's Response Not to Grant Summary Judgment to the Defendants" (ECF No. 47); and "Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment" (ECF No. 47-1). Plaintiff also filed a signed, notarized statement advising that he "understood that a false statement or answer to any question in this *affidavit* will subject [him] to penalties for perjury." (ECF No. 47-1) (emphasis added). Although this statement does not directly follow Plaintiff's self-styled "Affidavit" (ECF No. 46), the Court recognizes that *pro se* filings are to be liberally construed, and that Plaintiff is a prisoner. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed ....") (internal citation omitted). Accordingly, this Court considers Plaintiff's self-styled "affidavit" (ECF No. 46), together with his notarized statement (which specifically references "this affidavit") (ECF No. 47-1), as a valid affidavit for the purposes of this summary judgment motion. Fed. R. Civ. P. 56(c). The Court, therefore, considers these documents (ECF Nos. 46 and 47-1), along with Plaintiff's verified Amended Complaint to determine whether any material fact disputes preclude summary judgment. *Ward v. Moore*, 414 F.3d 968, 970 (8th Cir. 2005) (citing *Spear v. Dayton's*, 733 F.2d 554, 555-56 (8th Cir. 1984) (explaining that a verified complaint, signed under penalty of perjury is the equivalent of an affidavit and can serve as plaintiff's summary judgment response to under Fed. R. Civ. P. 56(e)).

4

warrant for his arrest for failure to appear.   (ECF No. 46, p. 1).   Defendant Dyer then went back to his vehicle and returned a few minutes later saying that both he and Adams were on parole with search waivers.   *Id*. at 2.   When Defendant Dyer directed them to exit the SUV, Plaintiff first grabbed the dog that was in the back and then he and Adams stood by the side of the road while Defendant Dyer searched the SUV.   *Id*.   During this time, Plaintiff tried to use his phone, but Defendant Dyer yelled at him, telling him not to.   *Id*.   Adams then asked Defendant Dyer if she could use her phone to call someone to get her dog and the SUV.   *Id*.   Defendant Dyer agreed, so Plaintiff called William Corbell and asked him to come to their location.   *Id*.   After Defendant Dyer finished searching the car, he told Plaintiff and Adams that they needed to talk about what he found in the car, and he asked Adams if there was anything in the SUV.   Adams responded, saying "there should not be" and Plaintiff told her "not to worry about it."   *Id*.

Corbell then showed up, and Deputy Dyer put Plaintiff in handcuffs and placed in the back of the squad car.   (ECF No. 46, p. 2).   At this point, a plain clothes officer arrived on the scene and started talking to Deputy Dyer.   *Id*.   Next, Corbell was arrested and put him in the back of the same squad car.   *Id*. at 2-3.   Although officers initially told Adams that she could not drive her car, they then gave her the keys back and allowed her to drive away.   *Id*.

Plaintiff and Corbell waited in the back of the squad car for almost 30 minutes for a tow truck to arrive to tow away Corbell's vehicle.   (ECF No. 46, p. 3).   After the tow truck took the car away, Defendant Dyer drove Plaintiff and Corbell to 141 N. Arkansas Ave.   *Id*.   Plaintiff says he asked Defendant Dyer why they were being brought back to the residence and explained that he did not reside at that residence, but Defendant Dyer did not say anything.   *Id*.   Plaintiff says that by the time they arrived, a plain clothes officer later identified as Defendant Chancey was

already searching the residence.   *Id*.   Plaintiff says that they stayed at 141 N. Arkansas Ave for approximately two minutes before Defendant Dyer drove them to jail.   *Id*.   Plaintiff says that he never told Defendant Dyer that he had moved to 141 N. Arkansas Avenue, and he never spoke to Defendant Chancey during his arrest.   *Id*.   Plaintiff says that both officers had his identification, which listed his address.   *Id*.

> ### B.   Defendants' Version

While speaking to Adams and Plaintiff when they were in the SUV, Defendant Dyer observed them both "suffleing [sic] around in there [sic] seats."   (ECF No. 43-2, p. 14; ECF No. 43-7, p. 1).   Defendant Dyer asked them to exit the SUV, and Plaintiff started making phone calls. (ECF No. 43-7, p. 2).   Defendant Dyer told Plaintiff he cannot make any phone calls during the traffic stop, and Plaintiff responded saying that he was trying to arrange for someone to get him out of jail.   *Id*.   When Defendant Dyer asked why Plaintiff thought he was going to jail, Plaintiff told him that he thought he had warrants for his arrest.   *Id*.   Adams also asked to call someone to come get her dog, and when Defendant Dyer inquired, Adams responded saying that she also thought she was going to jail.   *Id*.   Defendant Dyer then requested and obtained Adams's consent to search the SUV.   *Id*.

Pursuant to that search, Defendant Dyer located a glass pipe containing methamphetamine residue in the passenger door panel (where Plaintiff had been sitting).   (ECF No. 43-7, p. 2). Defendant Dyer confronted Adams and Plaintiff, saying that they found something they might need to talk about, and Plaintiff told Adams that "it was his and he would take it."   (ECF No. 43-2, p. 14).   Defendant Dyer then ran both their driver's licenses and learned that Adams's driver's license was suspended, and that there was a confirmed warrant for Plaintiff's arrest.   (ECF No.

43-7, p. 2).   Defendant Dyer told Adams she could not drive the vehicle and allowed her to call someone to pick her up, and she called William Corbell.   *Id*.   While waiting for Corbell to arrive, Defendant Dyer asked Plaintiff where he was living, and Plaintiff said he was renting a shed from Corbell at 141 N. Arkansas Avenue.   *Id*.   Defendant Dyer then placed Plaintiff under arrest for possession of drug paraphernalia and the outstanding warrant.   *Id*.   When Corbell arrived,[3] Defendant Dyer asked to see Corbell's driver's license and Corbell consented.   *Id.* at 3. Defendant Dyer ran Corbell's driver's license and learned there was also an active warrant for Corbell's arrest.   *Id*.   Defendant Dyer then placed Corbell under arrest for the warrant.   *Id*.

At this point, Defendant Chancey and Investigator Bishop arrived on the scene.   (ECF No. 43-7, p. 2).   Defendant Chancey observed money orders in Corbell's vehicle.   (ECF No. 43-8, p. 2).   Defendant Chancey had information that there was a stolen vehicle at Plaintiff's address in Fort Smith, Arkansas, and asked Plaintiff about this vehicle.   *Id*.   According to Defendant Chancey, the Plaintiff denied knowing anything about a stolen vehicle and stated that he was living at 141 N. Arkansas Avenue and paying rent to Corbell.   *Id*.   Corbell stated that he owned and resided at 141 N. Arkansas Avenue; Corbell's driver's license listed 141 N. Arkansas Avenue as his home address; and 141 N. Arkansas Avenue was listed as his address with the Arkansas Crime Information Center ("ACIC").   *Id*.

Defendant Chancey checked the ACIC and learned that both Plaintiff and Corbell were on parole and had "active search waivers on file."   (ECF No. 43-8, p. 2).   Based on this information, Defendant Chancey contacted Plaintiff's parole officer, Brian Tejada, informed him that Plaintiff

---

3 Corbell arrived with Savannah Hammond, and it was determined that Hammond also had a warrant for her arrest.   *Id*.

had stated that he was now living at 141 N. Arkansas Avenue, and asked Mr. Tejada if he could search the residence based on Plaintiff's search waiver.  *Id*.  Mr. Tejada confirmed that he could search the residence.  *Id*.  Defendant Chancey then directed Defendant Dyer to transport Plaintiff and Corbell to 141 N. Arkansas Avenue.

The property at 141 N. Arkansas Avenue consists of two sheds/storage buildings that have been converted into residences, a metal shop/detached garage, a camper trailer, and multiple vehicles.  (ECF No. 43-8, p. 2).  Defendant Chancey understood that Corbell lived in the "converted shed that was grey with a front porch and American flag," and that "Plaintiff lived in the adjacent converted shed, which was smaller than [Corbell's] residence, and had boards leaning against it and a metal roof."  *Id*.  At the time of the traffic stop, Defendant Dyer was aware that Defendant Chancey had placed the property under surveillance for suspected narcotics activity.  (ECF No. 43-7, p. 1).  According to Defendant Chancey, sometime prior to March 1, 2022, he had spoken to Confidential Informant A—an individual who Defendant Chancey knew to be reliable and who had previously provided information that had led to the successful prosecution of several narcotics cases—and learned that Plaintiff and Corbell were selling narcotics from that property.  (ECF No. 43-8, p. 1).

When they arrived on the property, Defendant Chancey observed a firearm in plain sight, propped up against what he believed to be Corbell's residence.  (ECF No. 43-8, p. 1).  Courtney Gothard was also present at the property.  *Id*.  She said that she and Plaintiff were living there.  *Id*.  Based on the information he had received from confidential informants, Plaintiff, Corbell, and Gothard, Defendant Chancey believed that Plaintiff resided on that property.  *Id*.  Defendant Chancey was also aware that both Plaintiff and Corbell were convicted felons.  *Id.*

While at the property, Gothard informed Defendant Chancey that there were two methamphetamine bongs under the porch; she recovered them and told Defendant Chancey they belonged to Plaintiff.  (ECF No. 43-8, p. 1).  Defendant Chancey started searching Corbell's residence pursuant to his "search waiver."  *Id*.  In that residence, Defendant Chancey located a syringe, .22 shells, and a press.  *Id*.  After locating the press, Gothard told Defendant Chancey that Plaintiff and Corbell were using the press to forge money orders.  *Id*.  She said they had successfully cashed forged money orders in the past.  *Id*.  Defendant Chancey then left the residence to request a search warrant, which he subsequently obtained.  *Id*.

The search warrant authorized the search of the property "known as: a singly-story residence that appears to be a wooden storage building converted into a residence, visible from the roadway with the address of 141 N Arkansas Ave, Alma, AR 72921, the detached shop, *and any other outbuildings*, campers, or vehicles on the property . . .."  (ECF No. 43-2, p. 4) (emphasis added).  Pursuant to the search warrant, officers continued the search of Corbell's residence and then also searched what they believed to be Plaintiff's residence—the smaller converted shed on the property.  (ECF No. 43-8, p. 4).

From the search of Corbell's residence, officers seized "a money press, blank checks, what appeared to be test prints consistent with the denominational print of a money order, a syringe, and a .380 pistol."  (ECF No. 43-8, p. 5).  From the search of what they believed to be Plaintiff's residence, officers seized "a green baggie with white crystal residue and a printer."  *Id*.  Defendant Chancey learned from Gothard that officers located a printer in their residence because Plaintiff was trying to learn how to print the money orders himself so that he could cut Corbell out of the process.  *Id*.  Gothard told Defendant Chancey that Plaintiff got the idea about forging

9

money orders from a man named "Kevin."   *Id*.   Defendant Chancey understood "Kevin" to be "Kevin Gilliam."   Prior to March 1, 2022, Defendant Chancey learned from Confidential Informant B—an individual who Defendant Chancey knows to be reliable and who has previously provided him with credible information that resulted in the recovery of stolen property—that he had heard from his friend, Kevin Gilliam, that Plaintiff and Corbell were forging money orders. *Id*.   According to Defendant Chancey, Confidential Informant B also told him that Kevin Gilliam was involved in forging money orders and that they were using a press that was in a large metal box to commit the forgeries.   *Id*.   Defendant Chancey says that the information he received from Gothard on March 1, 2022, was consistent with the information he had previously received from Confidential Informant B.   *Id*.   Gothard also provided a written statement to law enforcement consistent with what she reported to Defendant Chancey.   (ECF No. 43-2, p. 243).

Defendant Dyer did not participate in the search at 141 N. Arkansas Avenue.   (ECF No. 43-7, p. 3).   But he spoke to Gothard for several minutes.   *Id*.   During that conversation, Defendant Dyer learned that she and Plaintiff "stayed" at the 141 N. Arkansas Avenue property. *Id*.   Defendant Chancey did not transport Plaintiff and Corbell from the traffic stop to 141 N. Arkansas Avenue, nor from that address to the detention center.   (ECF No. 43-7, p. 3; ECF No. 43-8, p. 4).

Plaintiff was subsequently charged with second-degree forgery in violation of Ark. Code Ann. § 5-37-201; possession of drug paraphernalia in violation of Ark. Code Ann. § 5-64-433(a)(2)(A)(B); and felon in possession of a firearm in violation of Ark. Code Ann. § 5-73-103(a)(1)(c)(2).   (ECF No. 43-5, p. 1).   After pleading guilty to possession of drug paraphernalia, Plaintiff was sentenced to a five-year term of imprisonment in the Arkansas Division of Correction

("ADC") with an additional one-year suspended.  *Id.* at 3.  He also pleaded guilty to felon in possession of a firearm and received a six-year suspended imposition of sentence.  *Id.*  The second-degree forgery charge was dismissed.  *Id.* at 9.

Corbell was also charged with second-degree forgery in violation of Ark. Code Ann. § 5-37-201(a)(1)(c)(1); possession of drug paraphernalia in violation of Ark. Code Ann. § 5-64-443(a)(2)(A)(B); and felon in possession of a firearm in violation of Ark. Code Ann. § 5-73-103(a)(1)(c)(2).  (ECF No. 43-9, p. 1).  He pleaded guilty to all three counts and received a ten-year suspended imposition of sentence on the forgery charge, a six-year suspended imposition of sentence on the drug paraphernalia charge, and a six-year suspended imposition of sentence on the felon in possession charge.  *Id.* at 4.

## IV.    LEGAL ANALYSIS

The Court views Plaintiff's Amended Complaint as asserting two claims for relief: (1) Defendants Dyer and Chancey failed to transport him directly to jail following his March 1, 2022, arrest in violation of his constitutional rights; and (2) Defendant Chancey illegally searched 141 N. Arkansas Avenue on March 1, 2022, in violation of his constitutional rights.  (ECF No. 10).  Plaintiff brings his claims pursuant to 42 U.S.C. § 1983, which provides a federal cause of action against officials acting under color of state law for alleged deprivations of "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  *See* 42 U.S.C. § 1983.  Plaintiff identifies the defendants in their official and individual capacities. (ECF No. 10).

Defendants, in turn, argue the following bases for summary judgment: (1) Plaintiff's claims are barred by *Heck v. Humphrey*; (2) Plaintiff failed to state a constitutional claim for illegal

transport following his arrest; (3) Defendants did not violate Plaintiff's Fourth Amendment rights; (4) Defendant Chancey had probable cause to charge Plaintiff with second-degree forgery; (5) Defendants did not violate Plaintiff's Eighth Amendment right to be free from excessive bail; (6) Defendants are entitled to qualified immunity; and (7) there is no official capacity liability because Defendants were not acting pursuant to some unconstitutional policy.   (ECF No. 41).

Plaintiff opposes Defendants' Motion for Summary Judgment, generally arguing that Defendant Dyer failed to promptly transport him to jail after his arret, contrary to Ark. R. Crim. P. 4.6, and that the search of 141 N. Arkansas Ave. was illegal because he never told anyone he lived at that address.   (ECF No. 47-1, p. 1).   For the reasons outlined below, the Court largely agrees with the Defendants.

### A.   *Heck v. Humphrey*

Defendants assert that Plaintiff's claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), because the factual predicate of those claims—his transport following arrest and the search of 141 N. Arkansas Avenue—also led to state criminal charges; that Plaintiff pleaded guilty to two of those charges; and those convictions have not been overturned or otherwise invalidated.   (ECF No. 42).   But Defendants' view of *Heck* is much too broad.

To be sure, in *Heck*, the Supreme Court held that a Section 1983 action, such as this one, should be dismissed "if a judgment 'would necessarily imply the invalidity of [a plaintiff's] conviction or sentence,' unless the conviction or sentence was reversed, expunged, declared invalid, or called into question."   *Moore v. Sims*, 200 F.3d 1170, 1171 (8th Cir. 2000) (per curiam) (quoting *Heck*, 512 U.S. at 486-87)).   The Supreme Court explained, however, that some Section 1983 actions, "'even if successful, will *not* demonstrate the invalidity of any outstanding criminal

judgment' against a plaintiff and should be allowed to proceed."  *Id*. (quoting *Heck*, 512 U.S. at 486-87).   In footnote seven, the Supreme Court explained further:

> For example, a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction. Because of doctrines like independent source and inevitable discovery, and especially harmless error, such a § 1983 action, even if successful, would not necessarily imply that the plaintiff's conviction was unlawful.

*Heck*, 512 U.S. at 487 n.7 (internal citations omitted).

This is one such case.   Here, Plaintiff pleaded guilty to possession of drug paraphernalia for the methamphetamine pipe Defendant Dyer located in the front passenger seat panel of the SUV Adams was driving.   (ECF No. 43-6).   Plaintiff does not challenge the constitutionality of this search.   (ECF No. 10).   Plaintiff also pleaded guilty to being a felon in possession of a firearm after a firearm was found at 141 N. Arkansas Avenue, and he admitted to being on that property sometime before the search on March 1, 2022.   (ECF No. 43-6 at p. 12).   Plaintiff challenges the legality of *that* search.   (ECF No. 10).   Even if that search were illegal, however, the independent source and inevitable discovery doctrines could nevertheless apply, thereby rendering any items seized during that search—including the two guns—admissible.   *See United States v. Baez*, 983 F.3d 1029, 1036 (8th Cir. 2020) (describing the independent-source and inevitable discovery doctrines and explaining that the two doctrines are exceptions to the general rule that evidence acquired during—or as consequence to—a search that violates the Fourth Amendment is inadmissible).   Thus, even if Plaintiff successfully demonstrates in this Section 1983 action that the March 1, 2022, search of 141 N. Arkansas Ave was illegal, such a finding would not *necessarily* imply that his conviction for being a felon in possession of a firearm was unlawful. *Heck*, therefore, does not bar Plaintiff's claims.

### B.      Plaintiff's Claims

Turning now to the Plaintiff's claims themselves, Defendants assert that they are entitled to qualified immunity.   (ECF No. 41).   To determine whether the Defendants are entitled to qualified immunity, the Court conducts a two-part inquiry: "(1) whether the facts, viewed in the light most favorable to [Plaintiff], demonstrate the deprivation of a constitutional or statutory right; and (2) whether that right was clearly established at the time of the deprivation." *Ryno v. City of Waynesville*, 58 F.4th 995, 1004 (8th Cir. 2023).   "Qualified immunity protects all by the plainly incompetent or those who knowingly violate the law."   *Id.* (quoting *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021) (per curiam).   The Court has "the discretion to decide which of the two prongs of qualified-immunity analysis to tackle first."   *Id.* (quoting *Lombardo v. City of St. Louis*, 38 F.4th 684, 690 (8th Cir. 2022)).   "If [the court] conclude[s] that the alleged facts do not violate a constitutional right, then [the court] need not address the second inquiry, and the defendant[s] will be entitled to qualified immunity."   *Id.* (quoting *Groenewold v. Kelley*, 888 F.3d 365, 371 (8th Cir. 2018)).   Because the facts, when viewed in the light most favorable to Plaintiff, fail to establish a constitutional violation, Defendants are entitled to qualified immunity.

### 1.      Plaintiff's Transport Following Arrest

Plaintiff first claims that Defendant Dyer should have transported him directly to the jail after his March 1, 2022, arrest in accordance with Rule 4.6 of the Arkansas Rules of Criminal Procedure.   (ECF No. 10).   It is undisputed that after Plaintiff and Corbell were arrested at the traffic stop, Defendant Dyer first transported them to 141 N. Arkansas Avenue before taking them to the jail.   (ECF No. 46; ECF No. 43-7, p. 3).   The question, then, is whether this diversion constitutes a constitutional violation as a matter of law.

Rule 4.6 of the Arkansas Rules of Criminal Procedure provides, in full:

Any person arrested, if not released pursuant to these rules, shall be brought promptly to a jail, police station, or other similar place.   The arresting officer may, however, first take the person to some other place if:

(a) The person so requests; or

(b) Such action is reasonably necessary for the purpose of having the person identified:
   (i)   By a person who is otherwise unlikely to be able to make the identification; or
   (ii)  By a person near the place of the arrest or near the scene of a recently committed offense.

Ark. R. Crim. P. 4.6.

In this case, there are no facts in the summary judgment record to suggest that Plaintiff requested to be transported to 141 N. Arkansas Avenue, or that Corbell, who was also in the backseat of the same squad car, first requested to stop at that address.   Further, there are no facts in the record suggesting that Defendant Chancey directed Defendant Dyer to transport Plaintiff and Corbell to 141 N. Arkansas Avenue for identification purposes.   But, even if Defendant Dyer violated Rule 4.6 in failing to transport Plaintiff directly to jail following his arrest, such a failure does not automatically give rise to a *constitutional* violation.

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."   *Bahr v. Cnty. of Martin*, 771 F.Supp. 970, 974-75 (D. Minn. 1991) (citing *Graham v. Connor*, 490 U.S. 386, 393-94 (1989)).   For example, in *Adewale v. Whalen*, 21 F.Supp. 2d 1006 (D. Minn. 1998), law enforcement arrested the plaintiff for obstructing legal process, a misdemeanor offense.   *Id*. at 1009-11.   Even though Minn. R. Crim. P. 6.01 allows an arresting officer to "issue citations to persons subject to lawful arrest for misdemeanors, unless it reasonable appears to the officer that arrest or detention is necessary to

15

prevent bodily harm to the accused or another or further criminal conduct," Minn. R. Crim. P. 6.01, and the parties agreed that plaintiff could have been issued a citation, law enforcement arrested plaintiff and transported her to the jail for processing. *Id*. at 1010. After being acquitted of the charges, plaintiff filed suit, claiming, among other things, that her arrest violated the Fourth Amendment because it failed to comply with Minn. R. Crim. P. 6.01. *Id*. at 1011. The district court disagreed, concluding that the "procedure described in Minn. R. Crim P. 6.01 is not a federal right actionable under § 1983. Thus, even if defendant [] violated Rule 6.01, the violation would not support a § 1983 claim." *Id*. at 1015. The facts here are analogous to *Whalen*. Here, as in *Whalen*, Plaintiff asserts a violation of state procedural law—in this case, Ark. R. Crim. P. 4.6. As set forth in *Whalen*, however, a purported violation of *state* procedural law is not tantamount to a federal constitutional right. *See Whalen*, 21 F.Supp.2d at 1015; *see also Parada v. Anoka Cnty.*, 332 F.Supp.3d 1229, 1241 (D. Minn. 2018) (explaining that a purported violation of Minn. R. Crim. P. 6.01 is not sufficient to state a claim for a violation of the Fourth Amendment). Thus, to the extent that Plaintiff seeks to attach liability against the defendants for a purported violation of Ark. R. Crim. P. 4.6 under § 1983, such a claim fails as a matter of law.

This finding, however, does not end the analysis. The Court must also consider whether the delay in transporting Plaintiff to the jail following his arrest violated some *constitutional* right of the Plaintiff. The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment, therefore, governs Plaintiff's warrantless arrest for possession of drug paraphernalia. But Plaintiff was also arrested on a "failure to appear warrant." (ECF No. 43-7). Plaintiff does not dispute the validity of this warrant. (ECF No. 46). Plaintiff's claim, therefore, that his extended detention after his arrest violated his constitutional

rights is properly analyzed under the Due Process Clause of the Fourteenth Amendment. *Luckes v. Cnty. of Hennepin, Minn.*, 415 F.3d 936, 939 (8th Cir. 2005) (citing *Hayes v. Faulkner Cnty.*, 388 F.3d 669, 673 (8th Cir. 2004) (Due Process Clause controls when issue is extended detention following arrest by warrant).

In determining whether extended detention violates substantive due process, courts examine the "totality of the circumstances" and consider: "(1) whether the Due Process prohibits the alleged deprivation of rights; (2) whether the defendants' conduct offended the standards of substantive due process; and (3) whether the totality of the circumstances shocks the conscience." *Id*. Here, Defendant Dyer's conduct plainly does not reach this standard.

The United States Court of Appeals for the Eighth Circuit has previously stated that "the Due Process Clause of the Fourteenth Amendment protects an individual's liberty interest from unlawful state deprivation, such as where the state detains the individual after he is entitled to release." *Luckes*, 415 F.3d at 939. Assuming, without deciding, that Plaintiff's liberty interest is at issue here, this Court considers whether Defendant Dyer violated that interest in failing to immediately transport him to the jail following his arrest. He did not.

Here, Plaintiff does not challenge the initial traffic stop, the expansion of that stop, or his arrest. (ECF No. 10). Furthermore, it is undisputed that after his arrest, Defendant Dyer transported Plaintiff and Corbell to 141 N. Arkansas Avenue, which was being searched. (ECF No. 43-7). Defendant Dyer said that when he arrived at 141 N. Arkansas Avenue, he spoke to Gothard for "several minutes." *Id*. Plaintiff, by contrast, says that after Defendant Dyer transported them to 141 N. Arkansas Avenue, they stayed there "for approximately two minutes, then Defendant Dyer drove [them] to jail." (ECF No. 46). Viewed in the light most favorable to

17

Plaintiff, even if Defendant Dyer's diversion extended Plaintiff's detention by "several minutes," the duration of Plaintiff's extended detention falls well short of shocking the conscience.   *See Luckes*, 415 F.3d at 940 (post-arrest detention of 24 hours failed to "shock the conscience") (citing cases).   Further, Plaintiff does not allege any facts to suggest that the conditions of his extended duration (even if but for minutes) were conscience shocking.   *Id.* (finding that neither the extended duration nor quality of plaintiff's detention was "conscious-shocking").   Accordingly, the facts alleged, even when viewed in the light most favorable to Plaintiff, do not establish a constitutional violation.   Defendants are, therefore, entitled to qualified immunity on this claim.

### 2.   Search of 141 N. Arkansas Ave

Plaintiff also challenges the search of 141 N. Arkansas Avenue.   Defendants contend that Plaintiff does not have standing to contest the constitutionality of that search, and, even if he does have standing, the search of 141 N. Arkansas Avenue was conducted pursuant to a valid search warrant.   (ECF No. 41, p. 3).   Further, Defendants contend that Defendant Chancey had probable cause to believe that Plaintiff resided at 141 N. Arkansas Avenue.   *Id.*

There is clearly a fact dispute about whether Plaintiff told the Defendants he was residing at 141 N. Arkansas Avenue at the time of the traffic stop.   Defendant Dyer states that Plaintiff told him he was renting a shed from Corbell at 141 N. Arkansas Avenue during the traffic stop. (ECF No. 43-7, p. 2).   Defendant Chancey said that Plaintiff also told him during the traffic stop that he was currently living at 141 N. Arkansas Avenue and paying rent to Corbell.   (ECF No. 43-8).   Plaintiff, by contrast, maintains that he never told either Defendant Dyer or Defendant Chancey that he was residing at 141 N. Arkansas Avenue.   (ECF No. 46, p. 3).   Indeed, Plaintiff asserts that he never spoke to Defendant Chancey on March 1, 2022.   *Id.*   But for the reasons

outlined below, this fact dispute is not material.

### i.     Standing

As a threshold matter, Defendants argue that Plaintiff does not have standing to contest the constitutionality of the search at 141 N. Arkansas Avenue on March 1, 2022.   This Court is not persuaded.   Consistent with the Fourth Amendment's prohibition against unreasonable searches and seizures, "a [party] may challenge an unconstitutional search only if the [party] had a 'reasonable expectation of privacy' in the places searched or things seized."   *United States v. Juneau*, 73 F.4th 607, 613 (8th Cir. 2023) (quoting *Katz v. United States*, 389 U.S. 347, 360-61 (1967).

In determining whether a party has standing to challenge a search, "[t]here is no single metric or exhaustive list of considerations, but a [party's] expectation of privacy must be grounded in property law or understandings that are recognized by society."   *United States v. Bettis*, 946 F.3d 1024, 1027 (8th Cir. 2020) (internal quotation omitted).   In this case, Plaintiff maintains that he did not live at 141 N. Arkansas Avenue and that his driver's license did not list that address as his residence.   (ECF No. 46, p. 3).   Rather, Plaintiff says he was residing at 3901 Crystal Lane, Fort Smith, Arkansas at the time, and that he had arrived at 141 N. Arkansas Avenue on March 1, 2022, at 8:00 a.m. and was "stacking wood" prior to the traffic stop.   (ECF No. 43-6, p. 7). Plaintiff also says that he pleaded guilty to felon in possession of a firearm for "being on the property at one time but not when the firearm was found."   *Id*. at p. 8.   At most, these facts place Plaintiff in the category of "short term social guest."   Although the Supreme Court has held that short-term guests for *commercial* transactions do not have standing to challenge the constitutionality of the search, *see Minnesota v. Carter*, 525 U.S. 83, 91 (1998), it appears that

neither the Supreme Court nor the Eighth Circuit has squarely addressed whether short-term *social* guests also lack standing.   In any event, "because Fourth Amendment standing need not be addressed before addressing other aspects of the merits," the Court need not determine standing before deciding whether the search of 141 N. Arkansas Avenue on March 1, 2022, was constitutionally deficient.   *Juneau*, 73 F.4th at 614.

### ii.     The Initial Search of Corbell's Residence

Thus, assuming Plaintiff has standing to challenge the search of 141 N. Arkansas Avenue, the Court now considers the search itself.   Defendants contend this search was valid pursuant to a search warrant supported by probable cause.   (ECF No. 42).   The Court agrees but finds that there were multiple Fourth Amendment events leading up to the search warrant that also require discussion.

The first Fourth Amendment event was the initial search of Corbell's residence at 141 N. Arkansas Avenue.   It is uncontroverted that Corbell lived on that property.   The summary judgment record shows that Corbell told law enforcement that 141 N. Arkansas was his residence; 141 N. Arkansas was listed as his residence on his driver's license; and that address was listed as his parole address with the Arkansas Crime Information Center ("ACIC").   (ECF No. 43-8, at p. 2).   Although the property at 141 N. Arkansas Avenue consists of multiple buildings and there is a factual dispute about whether Plaintiff lived in the "converted shed [that] had boards leaning against it and a metal roof," there is no dispute that Corbell "lived in the converted shed that was grey with a front porch and American flag . . .."   *Id*. at p. 3.

Defendant Chancey, moreover, confirmed that Corbell, like Plaintiff, was on parole and that the two had signed valid "search waivers."   (ECF No. 43-8, p. 3).   Pursuant to Ark. Code

Ann. § 16-93-106:

> (a)
>
>> (1) A person who is placed on supervised probation or is released on parole under this chapter is required to agree to a waiver as a condition of his or her supervised probation or parole that allows any certified law enforcement officer or Division of Community Correction officer *to conduct a warrantless search of his or her person, place of residence, or motor vehicle at any time, day or night, whenever requested by the certified law enforcement officer or division officer*.
>>
>> (2) A warrantless search that is based on a waiver required by this section *shall be conducted in a reasonable manner but does not need to be based on an articulable suspicion that the person is committing or has committed a criminal offense.*
>
> (b)
>
>> (1) A person who will be placed on supervised probation or parole and is required to agree to the waiver required by this section shall acknowledge and sign the waiver.
>>
>> (2) If the person fails to acknowledge and sign the waiver required by this section, he or she is ineligible to be placed on supervised probation or parole.
>
> (c)     As used in this section, "residence" includes a garage or outbuilding on the property of a residence.

Ark. Code Ann. § 16-93-106 (emphasis added).

The Supreme Court, moreover, has held "that the parolee's acceptance of a clear and unambiguous search waiver significantly diminished his reasonable expectation of privacy" under the Fourth Amendment.  *United States v. Rivera*, Case No. 5:20-CR-50050-001, 2021 WL 1822297, at * 4 (W.D. Ark. May 6, 2021) (discussing *Samson v. California*, 547 U.S. 843 (2006)). Recognizing that the statute at issue in *Samson* is substantively identical to Ark. Code Ann. § 16-93-106, courts in this District have held that a valid search waiver pursuant to § 16-93-106 "does indeed permit suspicion-less searches [of the parolee] and his possessions." *Id*. at *5.   Thus, even

though Defendant Chancey plainly suspected Corbell (and Plaintiff) of forging money orders and engaging in drug trafficking, because Corbell was a parolee with a valid "search waiver" on file, Ark. Code Ann. § 16-93-106 authorized law enforcement to search his residence in the absence of *any* suspicion so long as the search was conducted in a "reasonable manner."   According to the undisputed facts in the summary judgment record, Defendant Chancey did just that: he first searched Corbell's residence at 141 N. Arkansas Avenue—the grey shed with the front porch and American flag.   (ECF No. 43-8, p. 4).   This initial search was, therefore, valid under the Fourth Amendment.

### iii.    Search of the Safe and Backpack

During the search of Corbell's residence pursuant to Ark. Code Ann. § 16-93-106, Defendant Chancey located a locked safe.   (ECF No. 43-2, p. 2).   Defendant Chancey "had the key from [Corbell's] property [and] opened the safe."   *Id*.   Inside the safe, Defendant Chancey located "a syringe and .22 shells."   *Id*.   Defendant Chancey also "took a back pack off of the wall, and inside [he] located a brown metal box with a handle on the side, emblazoned with the logo 'Kaymaster,' which appear[ed] to be some time [sic] of press."   *Id*.   The searches of the safe and backpack constitute the second and third Fourth Amendment events, respectively.

By its express terms, Ark. Code Ann. § 16-93-106 permits law enforcement to "conduct a warrantless search of [a parolee's] person, place of residence, or motor vehicle at any time, day or night, whenever requested by the certified law enforcement officer or division officer."   Ark. Code Ann. § 16-93-106(a)(1).   Because it is uncontroverted that the backpack and safe were found in Corbell's residence and that Corbell had signed a search waiver, the search of the backpack and safe were thus also valid pursuant to that search waiver.   *See Rivera*, 2021 WL

1822297 at *6 (concluding that defendant's valid search waiver required him to submit "his body and possessions," including the backpack he was carrying, to a suspicion-less search).   To hold otherwise would be to invite parolees to circumvent Ark. Code Ann. § 16-93-106 and the interests it furthers—the state's "overwhelming interests in supervising parolees because parolees are more likely to commit future criminal offenses," *Samson*, 547 U.S. 853 (cleaned up)—by simply placing their belongings in locked containers in their homes.

### iv.   The Search Warrant

This brings the Court to the final Fourth Amendment event: the search warrant.   It is uncontroverted that after Defendant Chancey located the syringe, .22 shells, and printing press, he stopped the search to request (and then obtain) a search warrant.   (ECF No. 43-8, p. 4).   The search of the property—including the building believed to be Plaintiff's abode—resumed pursuant to that search warrant, which authorized the search of "a single-story residence that appears to be a wooden storage building converted into a residence, visible from the roadway with the address of 141 N. Arkansas Ave, Alma, Ar 72921, the detached shop, *and any other outbuildings, campers, or vehicles on the property . . ..*"   (ECF No. 43-2, p. 4) (emphasis added).   Thus, the next question for the Court to consider is whether the search warrant was supported by probable cause.   It was.

"In reviewing whether a warrant was supported by probable cause, [the court's] role is to ensure that the issuing judge had a substantial basis for concluding that probable cause existed." *Juneau*, 73 F.4th at 614 (internal citation omitted).   "Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. (quoting *United States v. Gater*, 868 F.3d 657, 660 (8th Cir. 2017)).   "Probable cause . . . is not a high bar." *Id*. (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).   Further, "[w]hen, as

here, the issuing court relies solely on an affidavit to determine whether probable cause [exists], only the information 'found within the four corners of the affidavit may be considered.'" *Id.* (quoting *United States v. Wells*, 347 F.3d 280, 286 (8th Cir. 2003)).

Here, the search warrant affidavit provides, in pertinent part:

On March 01, 2022, Deputy Richard Dyer and I were in the area of 141 N. Arkansas Avenue in Crawford County.  A dark colored Scion XB was observed leaving the residence and headed South on N. Arkansas Ave.  Deputy Dyer was traveling South behind the vehicle and observed that the suv did not use a turn signal during the approach or while sitting at the stop sign, at the intersection of N. Arkansas Ave and Kibler Hwy.  Deputy Dyer initiated a traffic stop on the individuals and found probable cause for arrest on Mr. Christopher LeClair.  The driver of the vehicle Mrs. Roshell Adams did not have a valid license and called for a driver to come get her and her vehicle.  The driver of this second vehicle, Mr. William Corbell, and passenger Mrs. Savannah Hammond, arrived on scene and had confirmed warrants out of Sebastian County.  I noticed that there were money orders in the vehicle.  Mr. Leclair admitted while on scene that he had moved to 141 N. Arkansas and had been paying rent at the address.  Mr. Corbell advised that it was his residence as well.  Both individuals were on parole with active search waivers.  Deputy Dyer trasnproted Mr. Corbell and Mr. Leclair to 141 N. Arkansas Ave. and after speaking to Parole Officer Tejada he confirmed we were clear to search the residence.  I observed a black .22 caliber rifle leaned against the back of the residence.  Everyone staying at the residence is a convicted felon.  Investigator Edwin Bishop was notified by Mrs. Courtney Gothard, who stays at the residence, that there were two bongs used for meth at the resdience outside.  Inv. Bishop obtained them and they were placed on the tailgate of my vehicle.  I entered the residence and located a safe on the wall and I had the key from Mr. Corbell's property, I opened the safe and located a syringe and .22 shells inside the safe.  I took a backpack off the wall, and inside I located a brown metal box with a handle on the side, emblazoned with the logo "Kaymaster," which appears to be some time of press.  I was previously notified of this being at the residence from a reliable source and it fit the source's description.  I know that the source is reliable because the source previously provided information regarding a theft that resulting in arrest and recovery of stolen property.  The source advised that this press was being used by Mr. Corbell and Mr. Leclair to forge money orders.  I asked Mrs. Gothard to tell me about the device and she stated that she did not know exactly the use for the machine, but that Mr. Corbell and Mr. Leclaire are using digital devices along with the press to forge money orders.  Mrs. Gothard stated the indviduals are buying low denomination money orders to get the different sequential numbers on the checks and change the amounts.  This information is consistent with what was told to me in a prior interview with the reliable informant.

24

(ECF No. 43-2, pp. 1-2).   Even if the Court disregarded the statement about Plaintiff residing at 141 N. Arkansas Avenue, what remains is sufficient to establish probable cause.   It is undisputed that Defendant Chancey observed a firearm leaning up against Corbell's residence in plain view when he drove up to the property; it is also undisputed that Corbell is a felon, prohibited from possessing firearms.   (ECF No. 43-8, p. 3).   Further, it is uncontroverted that Corbell, a parolee, signed a valid search waiver and that pursuant to a search of his residence law enforcement located, among other things, a printing press.   *Id*.   The printing press matched the description of a device that a confidential informant had described to Defendant Chancey as being used by Corbell and Plaintiff to forge money orders.   *Id*. at p. 4.   This information, combined with Defendant Chancey's observation of money orders in Corbell's car during the traffic stop, is sufficient to establish a fair probability that additional evidence of forgery—or some other criminal activity— would be found on the property.   Law enforcement's search of the property at 141 N. Arkansas Avenue, including the buidling believed to be Plaintiff's abode, pursuant to the search warrant was, therefore, supported by probable cause.   Thus, Defendants' Motion for Summary Judgment on Plaintiff's claim challenging the search of 141 N. Arkansas Avenue should be GRANTED.[4]

---

[4] Defendants also assert that Defendant Chancey had probable cause to believe that Plaintiff lived in the shed with the "boards leaning against it and a metal roof," thereby justifying the search of that building pursuant to Plaintiff's valid search waiver under Ark. Code Ann. § 16-93-106.   (ECF No. 42).   Probable cause "exists under the Fourth Amendment when a police officer has reasonably trustworthy information that is sufficient to lead a person of reasonable caution to believe that the suspect has committed or is committing a crime."   *Klein v. Steinkamp*, 44 F.4th 1111, 1115 (8th Cir. 2022).   "Probable cause is a more demanding standard than reasonable suspicion.   'Reasonable suspicion can arise from information that is less reliable than that required to show probable cause.'"   *United States v. Thabit*, 56F.4th 1145, 1151 (8th Cir. 2023) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).   Here, it is undisputed that 141 N. Arkansas Avenue was not listed "on file" as Plaintiff's parole address.   Further, there is a fact dispute about whether Plaintiff told the Defendants that he resided at that address.   But even if Defendant Chancey did not have probable cause to believe that Plaintiff lived in one of the buildings at 141 N. Arkansas

### 3.     Probable Cause for Forgery

Defendants construe Plaintiff's Amended Complaint as claiming he was unlawfully charged with felonies stemming from the March 1, 2022, traffic stop and search of 141 N. Arkansas Avenue.   (ECF No. 42).   Plaintiff was charged with three felonies arising from those events: possession of drug paraphernalia, being a felon in possession of a firearm, and second-degree forgery.   (ECF No. 43-5).   Defendants contend that because Plaintiff pleaded guilty to possession of drug paraphernalia and felon in possession of a firearm, *Heck* bars him from challenging those charges.   (ECF No. 42).   Regarding the charge of second-degree forgery, Defendants assert that this charge was supported by probable cause.   *Id*.   The Court agrees.

As noted above, pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994), Section 1983 claims should be dismissed if a judgment would "would necessarily imply the invalidity of [a plaintiff's] conviction or sentence, unless the conviction or sentence was reversed, expunged, declared invalid, or called into question." *Sims*, 200 F.3d at 1171 (quoting *Heck*, 512 U.S. at 486-87).   Here, Plaintiff has not established that his convictions for possession of drug paraphernalia and being a felon in possession of a firearm have been dismissed or otherwise invalidated.   Accordingly, to

---

Avenue, the information Defendant Chancey received from Confidential Informant A and Gothard, at minimum, amounts to reasonable suspicion that Plaintiff resided at this address.

Although the Eighth Circuit recently held in *United States v. Thabit*, 56 F.4th 1145 (8th Cir. 2023), that "[a]n officer must have probable cause to believe that a dwelling is the residence of a parolee in order to initiate a warrantless search of a residence not known to be the home of a parolee." *Id.* at 1151.   This case law was not "clearly established" until *after* law enforcement searched 141 N. Arkansas Avenue on March 1, 2022.   *See Mullenix v. Luna*, 577 U.S. 7, 11 (2015) ("A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.").   Therefore, Defendant Chancey would be entitled to qualified immunity.   In any event, this Court need not decide the issue of whether law enforcement had probable cause to believe this building was Plaintiff's residence because, as noted above, the search of that building was valid pursuant to the search warrant.

the extent that Plaintiff claims his arrest on these charges was unsupported by probable cause, Defendants are plainly entitled to summary judgment on those claims.

This leaves the second-degree forgery charge. Plaintiff was charged with second-degree forgery in violation of Ark. Code Ann. § 5-37-20, which provides, in relevant part:

> (a) A person forges a written instrument if, with purpose to defraud, the person makes, completes, alters, counterfeits, possesses, or utters any written instrument to be or is calculated to become or to represent if completed the act of:
> (1) A person who did not authorize the act;
> . . .
>
> (c) A person commits forgery in the second degree if he or she forges a written instrument that is:
> (1) A deed, will, codicil, contract, assignment, check, commercial instrument, credit card, or other written instrument that does or may evidence, create, transfer, terminate, or otherwise affect a legal right, interest, obligation, or status;

Ark. Code Ann. § 5-37-201(a)(1)(c)(1).

A § 1983 claim asserting arrest without probable cause is analyzed under the Fourth Amendment. *Stewart v. Wagner*, 836 F.3d 978, 983 (8th Cir. 2016) (citing *Albright v. Oliver*, 510 U.S. 266, 270-71 & n.4 (1994)). Probable cause exists "if the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed . . . an offense at the time of arrest." *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1264 (8th Cir. 1996) (internal quotation omitted). "Probable cause is to be determined upon objective facts available to the officers at the time of arrest." *Id*.

Here, it is undisputed that Plaintiff was initially arrested because of the arrest warrant and for possession of drug paraphernalia. (ECF No. 43-7, p. 2). It is also undisputed that during the search of 141 N. Arkansas Avenue, law enforcement recovered what appeared to be a printing

27

press from Corbell's residence, and a printer from what they thought was Plaintiff's residence. (ECF No. 43-8, pp. 3-4).   This evidence, combined with the information Defendant Chancey had received from Confidential Informant B, who had told him that Corbell and Plaintiff were forging money orders, and the information Defendant Chancey received from Gothard, who purportedly also told him that Corbell and Plaintiff "were using digital devices and the press to forge money orders" (ECF No. 43-8, p. 4), plainly established probable cause for Defendant Chancey to believe that Plaintiff had committed second-degree forgery.   Thus, Defendant Chancey's decision to later charge Plaintiff with second-degree forgery was supported by probable cause and Defendants are entitled to summary judgment on this claim.

### 4.    Excessive Bail

Defendants also construe Plaintiff's Amended Complaint as alleging that Defendants violated his right under the Eighth Amendment to be free from excessive bail.   (ECF No. 42). But there are no facts—disputed or otherwise—suggesting that either Defendant was involved in setting Plaintiff's bail.   "Causation is an essential element of a section 1983 cause of action." *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).   Pursuant to the Arkansas Rules of Criminal Procedure, the presiding judicial officer—not the arresting officer—sets a detainee's conditions of pretrial release, including establishing money bail, if any.   *See, e.g.*, Ark. R. Crim. P. 9.2(a) ("The judicial officer shall set money bail only after he determines that no other conditions will reasonable ensure the appearance of the defendant in court."); *see also Walden v. Carmack*, 156 F.3d 861, 874 (8th Cir. 1998) (sheriff not liable under § 1983 for recommending excessive bail because "setting the bail bond is entirely at the discretion of the presiding judge").   Accordingly, to the extent that Plaintiff claims that the bail imposed upon his arrest violated his right to be free

from excessive bail, the Defendants are entitled to summary judgment as to that claim.

### 5.    Official Capacity Claims

Finally, Plaintiff identifies the Defendants in their individual and official capacities.   (ECF No. 10).   "A suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent," or, in this case, Crawford County, Arkansas.   *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006).   To prevail on a claim against Crawford County, Plaintiff must show that the constitutional violation resulted from (1) an "official policy," (2) an unofficial "custom"; or (3) a deliberately indifferent failure to train or supervise.   *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir. 2016).   In this case, however, the Court finds that Plaintiff's detention immediately following his arrest was not unlawful, and that the search of 141 N. Arkansas Avenue on March 1, 2022, was constitutionally valid.   Thus, because Plaintiff's constitutional rights were not violated by a Crawford County employee, Crawford County itself is not liable as a matter of law.   *See Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018) ("[T]here must be an unconstitutional act by a municipal employee before a municipality can be held liable . . ..") (internal citations omitted).   Plaintiff's official capacity claims should, therefore, be dismissed.

## V.    CONCLUSION

For the reasons stated, it is recommended that Defendants' Motion for Summary Judgment, (ECF No. 41) be **GRANTED** and that this matter be **DISMISSED with PREJUDICE**.

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).   The failure to file timely objections may result in waiver of the right to appeal questions of fact.   The parties**

are reminded that objections must be both timely and specific to trigger de novo review by the district court.

**STATUS OF REFERRAL: NO LONGER REFERRED**

DATED this 13th day of February 2024.

/s/ *Mark E. Ford*

HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE